UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL D. BILLINGS and MDB GROUP, LLC; TERRY WAYNE KELLY, JR. and KELLY MANAGEMENT, LLC; and WILLIAM B. MCHENRY, JR. and FIRST SOUTH INVESTMENTS, LLC,<br><br>Defendants. | Case No. 3:18-cv-679-CWR-FKB<br><br>Arising out of Case No. 3:18-cv-252, *Securities and Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*<br><br>Hon. Carlton W. Reeves, District Judge |

# COMPLAINT

Alysson Mills, in her capacity as the court-appointed receiver for Arthur Lamar Adams and Madison Timber Properties, LLC (the "Receiver"), through undersigned counsel, files this Complaint against Defendants Michael D. Billings and MDB Group, LLC; Terry Wayne Kelly, Jr. and Kelly Management, LLC; and William B. McHenry, Jr. and First South Investments, LLC (collectively "Defendants"), stating as follows:

1366750v.1

## INTRODUCTION

Arthur Lamar Adams ("Adams"), through his company Madison Timber Properties, LLC ("Madison Timber"), operated a $100 million Ponzi scheme that defrauded hundreds of investors. Investors believed that Madison Timber used investors' money to purchase timber from Mississippi landowners; that Madison Timber sold the timber to Mississippi lumber mills at a higher price; and that Madison Timber repaid investors their principal and promised interest with the proceeds of those sales. Investors received timber deeds and cutting agreements that purported to secure their investments—but the documents were fake. There was no timber and no proceeds from sales of timber. The money used to repay existing investors came solely from new investors. Like any Ponzi scheme, Madison Timber required more and more new investors to continue.

Defendants identified new investors and sold to them Madison Timber investments. For each investment made by an investor he personally recruited, each Defendant received a cut of the investor's payment to Madison Timber. Over time, Defendants received more than $16,000,000 in Madison Timber "commissions." By this complaint the Receiver seeks to return that money to the receivership estate, to maximize funds available for distribution to victims.

The Receiver desires to resolve the Receiver's claims against Defendants efficiently, to minimize time and expense to the receivership estate. Prior to the filing of this complaint, the Receiver invited each Defendant to join her in the filing of a motion that proposes terms by which the parties might attempt to negotiate a settlement: The Receiver agrees to suspend further litigation against a Defendant if the Defendant waives certain procedural objections and agrees to 1) make a full and complete financial disclosure, 2) commit to negotiate in good faith, and 3) preserve assets pending negotiations. If the parties do not reach a settlement, the Receiver may

2

amend this complaint within 21 days as a matter of course, and thereafter with this Court's permission, to state further factual allegations against the Defendant.

Defendants Terry Wayne Kelly, Jr. and Kelly Management, LLC; and William B. McHenry, Jr. and First South Investments, LLC join the Receiver's motion. Defendants Michael D. Billings and MDB Group, LLC do not.

## JURISDICTION AND VENUE

1.

The Court has jurisdiction over this action and its parties, and venue is proper in this Court, pursuant to the Securities Act of 1933, 15 U.S.C. § 77v(a); the Securities & Exchange Act of 1934, 15 U.S.C. § 78aa; 28 U.S.C. § 1692; and 28 U.S.C. § 754.

2.

This action arises in connection with and is ancillary to the civil action already pending in this Court styled *Securities & Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*, No. 3:18-cv-252-CWR-FKB. In that civil action, the Securities & Exchange Commission ("S.E.C.") alleges that "[b]eginning in approximately 2004," Adams, through Madison Timber, "committed securities fraud by operating a Ponzi scheme" in violation of the Securities Act of 1933 and Securities & Exchange Act of 1934.[1]

3.

The S.E.C. requested that the Court appoint a receiver for the estates of Adams and Madison Timber.[2] As the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver in the execution of her duties. "[I]t is well-settled that when an initial suit results in the appointment of the receiver, any suit that the receiver thereafter brings in

---

[1] Doc. 3, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).
[2] Docs. 11, 21, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

the appointment court in order to execute h[er] duties is ancillary to the main suit." *U.S. Small Bus. Admin. v. Integrated Envtl. Sols., Inc.*, No. 05-cv-3041, 2006 WL 2336446, at *2 (S.D. Tex. Aug. 10, 2006) (citing *Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 (6th Cir. 1981)).  *See also* 28 U.S.C. § 1692 ("In proceedings in a district court where a receiver is appointed for property, real, personal, or mixed, situated in different districts, process may issue and be executed in any such district as if the property lay wholly within one district . . . ").

4.

Consistent with that precedent, Chief U.S. District Judge Daniel P. Jordan III has ordered that all "cases filed by the duly appointed Receiver . . . which . . . arise out of or relate to [*Securities & Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*, No. 3:18-cv-252-CWR-FKB] shall be directly assigned by the Clerk of Court to U.S. District Judge Carlton W. Reeves and U.S. Magistrate Judge F. Keith Ball."[3]  In compliance with Chief Judge Jordan's order, the Receiver shall separately file, contemporaneously with this complaint, a notice of relatedness.

5.

Within ten days of her appointment, the Receiver filed notices of receivership in every federal district court in the United States, thus ensuring complete jurisdiction and control of any real or personal property owned by Adams or Madison Timber in the United States pursuant to 28 U.S.C. § 754.

---

[3] Doc. 45, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

4

1366750v.1

## PARTIES

6.

Plaintiff Alysson Mills is the Court-appointed Receiver for the estates of Adams and Madison Timber. The Court's order of appointment vests in her the power to, among other things:

> investigate and . . . bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging her duties as Receiver.[4]

The Receiver brings this civil action in her capacity as Receiver and pursuant to the powers vested in her by the Court's orders and applicable law.

7.

Defendant Michael D. Billings is an adult resident of Dallas, Texas.

8.

Defendant MDB Group, LLC ("MDB Group") is a Texas limited liability company. On information and belief, Billings is the sole member and manager of MDB Group. On information and belief, Madison Timber "commissions" were MDB Group's sole source of income.

9.

Defendant Terry Wayne Kelly, Jr. ("Kelly") is an adult resident of Madison, Mississippi.

10.

Defendant Kelly Management, LLC ("Kelly Management") is a Mississippi limited liability company. On information and belief, Kelly is the sole member and manager of Kelly Management.

---

[4] Doc. 33, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss). By order dated August 22, 2018, the Court eliminated the requirement that the Receiver obtain "prior approval of this Court upon ex parte request" before bringing any legal action. Doc. 38, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

1366750v.1

11.

Defendant William B. McHenry, Jr. ("McHenry") is an adult resident of Madison, Mississippi.

12.

Defendant First South Investments, LLC ("First South") is a Mississippi limited liability company. On information and belief, McHenry is the sole member and manager of First South.

## FACTUAL ALLEGATIONS RELEVANT TO ALL COUNTS

13.

Beginning in approximately 2004, Adams, through Madison Timber, operated a Ponzi scheme that purported to purchase timber from Mississippi landowners and resell it to Mississippi lumber mills at higher prices.

14.

Investors in Madison Timber delivered to Madison Timber large sums of money, typically in excess of $100,000 dollars, in reliance on the promise that Madison Timber would repay them their principal plus interest of not less than 12% per annum, and sometimes as much as 20% per annum. The promised interest invariably far exceeded the interest any investor might receive on any other collateralized investment.

15.

Investors believed that Madison Timber would use their money to acquire timber deeds and cutting agreements from Mississippi landowners; that Madison Timber would then sell the timber to Mississippi lumber mills at a higher price; and that with the proceeds of those sales Madison Timber would repay investors their principal and promised interest.

16.

In exchange for their investments, investors in the Madison Timber Ponzi scheme received a promissory note in the amount of their investment, payable in twelve monthly installments together with the promised interest; twelve pre-dated checks, each in the amount of the installment due under the promissory note; a timber deed and cutting agreement by which a named landowner purported to grant to Madison Timber the rights to harvest timber on the land described in the deed; and a timber deed and cutting agreement by which Madison Timber purported to grant its own rights to the investor.

17.

Investors did not know that, in fact, the timber deeds and cutting agreements that they received were fake.

18.

Investors did not know that because Madison Timber had no, or virtually no, revenues whatsoever, investors were being repaid with new investors' money.

19.

Each month, Madison Timber required more and more new investors to repay existing investors. Defendants identified new investors and sold to them Madison Timber investments.

20.

For each investment made by an investor he personally recruited, each Defendant received a cut of the investor's payment to Madison Timber. Over time, Defendants received more than $16,000,000 in Madison Timber "commissions."

21.

In April 2018, on the heels of investigations of him by the F.B.I. and the U.S. Attorney's Office for the Southern District of Mississippi, Adams turned himself in.

22.

The U.S. Attorney's Office for the Southern District of Mississippi charged Adams with two counts of wire fraud and one count of bank fraud in connection with a broader scheme to defraud. Among other things, the bill of information states that as "part of the scheme and artifice to defraud" Adams "paid commissions to recruiters who referred investors to [him]":

> The commissions were paid from investors' money. For example, ADAMS paid one recruiter approximately two million four hundred forty-five thousand four hundred and forty-nine dollars ($2,445,449) in commissions in 2017 alone. ADAMS paid another recruiter approximately one million six hundred twenty-eight thousand one hundred dollars ($1,628,100) in commissions in 2017 . . . .[5]

23.

Separately, the S.E.C. charged Adams with violations of the Securities Act of 1933 and Securities & Exchange Act of 1934, alleging in its complaint that "[b]eginning in approximately 2004," Adams, through Madison Timber, "committed securities fraud by operating a Ponzi scheme."[6]

24.

On May 9, 2018, Adams pleaded guilty to the federal crime of wire fraud[7] in connection with his operation of the Madison Timber Ponzi scheme. The fact that Madison Timber was a Ponzi scheme is not in dispute.

---

[5] Doc. 1, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss).
[6] Doc. 3, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).
[7] Doc. 11, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss).

1366750v.1

**FACTUAL ALLEGATIONS RELEVANT TO BILLINGS AND MDB GROUP**

25.

Billings became a recruiter for Madison Timber by no later than 2012, while he was employed by Butler Snow Business Advisory Services, LLC ("Butler Snow"). Madison Timber paid Butler Snow a monthly retainer for "strategic business development, strategic financing/capital strategies and overall management advisory" services. Butler Snow and Billings introduced Madison Timber to potential investors and Madison Timber paid Butler Snow and Billings a "success fee" when an investor invested.

26.

In December 2013, Billings left Butler Snow for the prospect of recruiting new investors to Madison Timber fulltime. Adams agreed to pay Billings 2%, and later 2.5%, of each dollar of each investment made by an investor that Billings personally recruited. In addition, Madison Timber paid Billings a fee of $10,000, and later $12,500, a month. These agreements were honored until the collapse of the Ponzi scheme in April 2018.

27.

Among Adams's "bird dogs," Billings was a standout. On information and belief, when Adams met Billings in 2012, Madison Timber had annual investments of approximately $15,000,000. With Billings's help, the Ponzi scheme ballooned. Billings targeted large investors in Texas and California, often dropping certain investors' names to attract new investors. On information and belief, Billings personally "booked" more than $80,000,000 in investments in 2017 alone. Billings was always hunting for "more, and more and more!!"

28.

Billings promoted Madison Timber as a safe and secured investment that paid interest at rates that substantially exceeded market interest rates.  In a typical presentation, Billings told the investor that the investment was safe because Madison Timber had longstanding relationships with Mississippi lumber mills that would pay a premium to lock-down timber rights. Billings explained that proceeds from the sale of timber would pay the investor monthly installments of one-twelfth of their principal investment, plus interest.

29.

Billings told the investor that a default was highly unlikely, but in the event of a default, the investor would be fully protected because his or her promissory note was secured by his or her own timber deed and cutting agreement that the investor could liquidate for whatever remaining amount Madison Timber owed. In fact, the timber deeds and cutting agreements were worthless.

30.

A cursory inspection of Madison Timber's operations would have revealed Madison Timber to be a classic Ponzi scheme. Among other things, Billings knew or should have been aware of each of the following—any one of which is suspicious standing alone, but taken together clearly evidence a fraud:

   a) The timber deeds and cutting agreements between landowners and Madison Timber were fake.  Indeed the landowners' signatures, forged by Adams, often looked the same. *A call to any one of the hundreds of purported landowners, or a simple check of the title for any one of the hundreds of purported tracts of land, would have confirmed the truth.*

   b) Madison Timber had no contracts with lumber mills. *A call to any one of the lumber mills for which Madison Timber purported to have supply agreements would have confirmed the truth.*

   c) Madison Timber required that an investor agree that he or she would not record the deed by which Madison Timber purported to grant its own rights to the investor

       unless and until Madison Timber failed to make a payment due under the promissory note.

   d) The interest rate that Madison Timber paid was typically 300% to 400% of that payable by any other fully collateralized investment.

   e) Madison Timber purported to have identified lumber mills with insatiable demand for timber and at uniform prices. *The market price for timber is readily available from multiple sources, and any one of those sources would have confirmed that the market price for timber rises and falls, sometimes dramatically, over short periods of time.*

   f) In October 2016, Madison Timber abruptly changed banks, and each recruiter was responsible for collecting within a short period of time all outstanding pre-dated checks from his individual investors and then reissuing new pre-dated checks drawn from Madison Timber's new account at a different bank. *Billings's investors transacted their business via wires. Billings told his investors that "[o]ur banker of some twenty plus years left Trustmark Bank, and we of course went with him."*

31.

Moreover, Billings was paid to understand Madison Timber's business. At Butler Snow, Billings provided "strategic business development, strategic financing/capital strategies and overall management advisory" services to Madison Timber. Billings knew or should have known that Madison Timber was a Ponzi scheme. At a bare minimum, in inducing persons to invest, Billings was reckless and indifferent as to the existence of the Ponzi scheme.

32.

In August 2017, Billings celebrated his "fifth anniversary" with Madison Timber. He thanked Adams for the "exceptional association and collaboration" and said "it is truly amazing what we have accomplished together." He reflected: "I can't decide whether 'The Odd Couple', Grumpy Old Men' . . . or at this point perhaps just 'Big' would be the best title to describe us. . . . I can only conclude that it is 'A God Thing'!!"

11

33.

Between 2013 and April 2018, Billings induced dozens of persons to invest in Madison Timber. In exchange, he and MDB Group received Madison Timber "commissions" of not less than $3,513,780.

34.

On information and belief, between 2013 and April 2018, Billings's Madison Timber "commissions" made up all or virtually all of MDB Group's income. MDB Group had no other business; it was funded solely with proceeds of the Madison Timber Ponzi scheme. It had no operations and no employees. Billings was MDB Group's sole manager and member, and directed the disbursement of MDB Group's income to himself.

**FACTUAL ALLEGATIONS RELEVANT TO KELLY AND KELLY MANAGEMENT**

35.

Kelly sold Madison Timber investments as early as 2010. Madison Timber paid Kelly 3% to 3.5% of each dollar of each investment made by an investor that Kelly personally recruited, and 1% to 1.5% of each dollar of each investment made by an investor that Billings personally recruited. On information and belief, the agreement was not committed to writing but was honored until the collapse of the Ponzi scheme in April 2018.

36.

Between 2010 and April 2018, Kelly sold investments in Madison Timber to dozens of investors. In exchange, he and Kelly Management received Madison Timber "commissions" of not less than $9,674,615. On information and belief, out of the "commissions" Kelly Management received, Kelly Management paid a total of $1,456,811 in "commissions" to sub-recruiters during

the same time period. Accounting for "commissions" paid to sub-recruiters, Kelly and Kelly Management received net "commissions" of $8,217,804.

### FACTUAL ALLEGATIONS RELEVANT TO MCHENRY AND FIRST SOUTH

37.

McHenry sold Madison Timber investments as early as 2010. Adams agreed to pay to McHenry 10% of each dollar of each investment made by an investor that McHenry personally recruited. On information and belief, the agreement was not committed to writing but was honored until the collapse of the Ponzi scheme in April 2018.

38.

Between 2010 and April 2018, McHenry sold investments in Madison Timber to approximately twenty investors. In exchange, he and First South received Madison Timber "commissions" of not less than $3,473,320.

### CAUSES OF ACTION
### COUNT I
### AGAINST ALL DEFENDANTS
### FOR THE RETURN OF COMMISSIONS AND FEES
### PURSUANT TO THE MISSISSIPPI UNIFORM FRAUDULENT TRANSFER ACT

39.

The Receiver re-alleges paragraphs 1 through 38 as though stated fully herein.

40.

The Receiver may avoid any transfer made in violation of the Mississippi Uniform Fraudulent Transfer Act (the "Act"), Mississippi Code Ann. §15-3-101, *et seq.*

41.

Pursuant to § 107 of the Act, the Receiver may recover from any party any funds that Madison Timber transferred with the actual intent to hinder, delay, or defraud any of its creditors. Because Madison Timber was a Ponzi scheme, by definition all transfers by Madison Timber were made with the actual intent to hinder, delay, or defraud its creditors.

42.

The Receiver is entitled to avoid all "commissions," fees, and other such payments paid by Madison Timber to Billings and MDB Group and to the entry of a judgment against Billings and MDB Group, jointly and severally, for the amount of all such monies received by them, estimated by the Receiver to be not less than $3,513,780.

43.

The Receiver is entitled to avoid all "commissions," fees, and other such payments paid by Madison Timber to Kelly and Kelly Management and to the entry of a judgment against Kelly and Kelly Management, jointly and severally, for the amount of all such monies received by them, estimated by the Receiver to be not less than $8,217,804.

44.

The Receiver is entitled to avoid all "commissions," fees, and other such payments paid by Madison Timber to McHenry and First South and to the entry of a judgment against McHenry and First South, jointly and severally, for the amount of all such monies received by them, estimated by the Receiver to be not less than $3,473,320.

## COUNT II
## AGAINST DEFENDANTS BILLINGS AND MDB GROUP
## FOR THE RETURN OF COMMISSIONS AND FEES
## PURSUANT TO THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT

45.

The Receiver re-alleges paragraphs 1 through 44 as though stated fully herein.

46.

The Receiver understands, and therefore represents, that all transfers to Billings and MDB Group were made or deemed to have been made in the State of Mississippi, such that they are subject to the Mississippi Uniform Fraudulent Transfer Act (the "Act"), Mississippi Code Ann. §15-3-101, *et seq.*

47.

If, however, the Court determines that the transfers to Billings and MDB were made or deemed to have been made in the State of Texas, they instead are subject to the Texas Uniform Fraudulent Transfer Act, Texas Business and Commerce Code §24.001, *et seq.* (the "Texas Act"). Under the Texas Act, the Receiver is entitled to avoid "commissions," fees, or other such payments to Billings and MDB Group.

48.

The Receiver is entitled to avoid all "commissions," fees, and other such payments paid by Madison Timber to Billings and MDB Group and to the entry of a judgment against Billings and MDB Group, jointly and severally, for the amount of all such monies received by them, estimated by the Receiver to be not less than $3,513,780.

49.

In addition, pursuant to § 24.01 of the Texas Act, the Receiver is entitled to an award of her attorney's fees and all costs.

## COUNT III
## AGAINST ALL DEFENDANTS
## FOR UNJUST ENRICHMENT

50.

The Receiver re-alleges paragraphs 1 through 49 as though stated fully herein.

51.

In the alternative, each of the Defendants has been unjustly enriched at the expense of Madison Timber and its innocent investors. At all relevant times, Madison Timber was a Ponzi scheme, and Defendants provided no legally cognizable consideration for the "commissions," fees, and other such payments paid to them. Accordingly, the Receiver is entitled to the entry of a judgment against each of the Defendants in the amount of the "commissions," fees, and other such payments they received.

52.

The Receiver is entitled the entry of a judgment against Billings and MDB Group stating that they have been unjustly enriched and are liable, jointly and severally, for an amount equal to the "commissions," fees, and other such payments they received, estimated by the Receiver to be not less than $3,513,780.

53.

The Receiver is entitled the entry of a judgment against Kelly and Kelly Management stating that they have been unjustly enriched and are liable, jointly and severally, for an amount

equal to the "commissions," fees, and other such payments they received, estimated by the Receiver to be not less than $8,217,804.

54.

The Receiver is entitled to the entry of a judgment against McHenry and First South stating that they have been unjustly enriched and are liable, jointly and severally, for an amount equal to the "commissions," fees, and other such payments they received, estimated by the Receiver to be not less than $3,473,320.

## COUNT IV
### FOR ENTRY OF PRELIMINARY AND PERMANENT INJUNCTION AGAINST BILLINGS AND MDB GROUP

55.

The Receiver re-alleges paragraphs 1 through 54 as though stated fully herein.

56.

On information and belief, Madison Timber "commissions" were MDB Group's sole source of income—that is, MDB Group was funded solely through the proceeds of the Madison Timber Ponzi scheme. On information and belief, MDB Group's disbursements of money received from Madison Timber were Billings's sole source of income for several years.

57.

On information and belief, Billings and MDB Group will be unable to pay any judgment against them in the Receiver's favor, for the benefit of the receivership estate and victims, if Billings transfers, sells, encumbers, or otherwise devalues any asset in his possession, or if MDB Group disburses whatever money remains in its accounts.

58.

The Receiver is entitled to preliminary injunctive relief in the form of an order restraining Billings, MDB Group, and any persons or entities acting in concert with them, from transferring, selling, encumbering, or otherwise devaluing (i) any funds of MDB Group; (ii) any other assets of any type or description as to which MDB Group or Madison Timber has any legal or equitable interest; (iii) any funds or other assets of any type or description that MDB Group transferred, disbursed, or conveyed to Billings; and (iv) any assets of any type or description as to which Billings has any legal or equitable interest and which was acquired, whether in whole or in part, with funds or other assets received by him from MDB Group or Madison Timber.

59.

There is a substantial likelihood that the Receiver will prevail on the merits of her claims and obtain a judgment against Billings and MDB Group.

60.

There is a substantial likelihood that the Receiver, whose primary objective is to maximize funds available to distribute to victims, will be irreparably harmed in the absence of preliminary injunctive relief. If Billings and MDB Group are not restrained as requested, there is a substantial risk that any funds or assets they obtained directly or indirectly from Madison Timber will be transferred, sold, encumbered, or otherwise devalued such that any judgment in the Receiver's favor will be uncollectible.

61.

Billings and MDB Group will not be unjustly affected by the preliminary injunctive relief requested because it only restrains their ability to transfer, sell, encumber, or otherwise devalue funds or assets they obtained directly or indirectly from Madison Timber.

62.

The preliminary injunctive relief requested will serve the public interest by maximizing funds available to distribute to victims.

63.

The preliminary injunctive relief requested does not require a bond, but should the Court determine that it does, the Receiver respectfully suggests that the bond should be in a nominal amount.

64.

The Receiver further requests that, after due proceedings, the preliminary injunctive relief requested should be made permanent.

_____

WHEREFORE, the Receiver respectfully requests that, after due proceedings, the Court enter judgments:

1. awarding damages in her favor and against Michael D. Billings and MDB Group, LLC, jointly and severally, for an amount equal to the "commissions," fees, and other such payments they received from Madison Timber, estimated by the Receiver to be not less than $3,513,780;

2. awarding damages in her favor and against Terry Wayne Kelly, Jr. and Kelly Management, LLC, jointly and severally, for an amount equal to the "commissions," fees, and other such payments they received from Madison Timber, estimated by the Receiver to be not less than $8,217,804;

3. awarding damages in her favor and against William B. McHenry, Jr. and First South Investments, LLC, jointly and severally, for an amount equal to the "commissions," fees, and other such payments they received from Madison Timber, estimated by the Receiver to be not less than $3,473,320;

4. granting the preliminary injunctive relief requested against Michael D. Billings and MDB Group, LLC, and, after due proceedings, making the relief permanent;

5. awarding any and all attorney's fees, costs, and interest allowed by contract or law;

6. awarding any and all other relief as may be just and equitable.

October 1, 2018

Respectfully submitted,

*/s/  Lilli Evans Bass*

BROWN BASS & JETER, PLLC
Lilli Evans Bass, Miss. Bar No. 102896
1755 Lelia Drive, Suite 400
Jackson, Mississippi 39216
Tel: 601-487-8448
Fax: 601-510-9934
bass@bbjlawyers.com
*Receiver's counsel*

*/s/ Brent B. Barriere*

FISHMAN HAYGOOD, LLP
*Motions for admission pro hac vice forthcoming*
Brent B. Barriere, *Primary Counsel*
Jason W. Burge
Kristen D. Amond
Rebekka C. Veith
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana 70170
Tel: 504-586-5253
Fax: 504-586-5250
bbarriere@fishmanhaygood.com
jburge@fishmanhaygood.com
kamond@fishmanhaygood.com
rveith@fishmanhaygood.com
*Receiver's counsel*