UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| **ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC,**<br><br>   **Plaintiff,**<br><br> v.<br><br>**MICHAEL D. BILLINGS and MDB GROUP, LLC; TERRY WAYNE KELLY, JR. and KELLY MANAGEMENT, LLC; and WILLIAM B. MCHENRY, JR. and FIRST SOUTH INVESTMENTS, LLC,**<br><br>   **Defendants** | Case No. 3:18-cv-679-CWR-FKB<br><br>Arising out of Case No. 3:18-cv-252, *Securities and Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*<br><br>Hon. Carlton Reeves, District Judge<br>Hon. F. Keith Ball, Magistrate Judge |

### AFFIRMATIVE DEFENSES AND ANSWER OF DEFENDANTS MICHAEL D. BILLINGS AND MDB GROUP, LLC TO AMENDED COMPLAINT

 Michael D. Billings and MDB Group, LLC (collectively, "Billings") Answer the Amended Complaint **[Dkt. 15]** (the "Complaint") filed by Allyson Mills (the "Receiver"), in her capacity as Receiver for Arthur Lamar Adams ("Adams") and Madison Timber Properties, LLC ("MTP").

### AFFIRMATIVE DEFENSES

#### First Defense

 At all material times Billings delivered reasonably equivalent value and acted in good faith and is not subject to forfeiture of any his earnings while acting in good faith.

## **ANSWER**

Billings answers the Amended Complaint as follows:

### **Introduction**

Billings denies any factual allegations intended to be made against him in the Receiver's wide-ranging "Introduction."

The court should be fully aware of the details, though, of what the Receiver means when she alleges that she "agreed to suspend further litigation" for purposes of negotiating.

All the Receiver "agreed" was this:

She would enter into settlement negotiations for fifteen (15) days *if* Mr. Billings would: 1) agree to spend no more than $7,500 of his money *in the aggregate* (*i.e.,* not a monthly amount); 2) agree to give up his procedural rights under the Federal Rules of Civil Procedure; 3) agree to entry of a scheduling order that put this case on a *60-day track* and would require him to prove to the court that he is entitled to any discovery in this matter; and 4) agree to financial disclosures far broader and more detailed than the Receiver would be able to obtain by means of proper discovery.

In return for giving up all these rights, Mr. Billings was to get in return a promise of fifteen (15) days of negotiation, following which the Receiver would have complete discretion to do whatever she liked with amendments to her (now-already-Amended) Complaint.

This is what the Receiver means when she alleges that she "agreed to suspend further litigation."

Absent from the Receiver's Introduction is any mention of the fact that counsel for Mr. Billings initiated efforts at good faith, detailed settlement negotiations in early July of this year. Counsel for Mr. Billings was finally granted a meeting with the Receiver's team on July 26, but any further contact was put off by counsel for the Receiver until after August 22. Finally, on September 20, the Receiver's team agreed to meet with counsel for Mr. Billings again.

It was at that September 20 meeting that the Receiver slid a draft complaint across the table to counsel for Mr. Billings, and counsel for the Receiver announced that she needed to know in five days whether Mr. Billings would sign off on the coercive "agreement" described above, or there would be no settlement negotiations.

Counsel for Mr. Billings declined that invitation to surrender Mr. Billings's procedural rights before this court, confident that his rights would be vindicated by this court. Mr. Billings still desires to negotiate a resolution of this matter without litigation, he cannot submit to the arbitrary preconditions demanded by the Receiver. If she is ready to negotiate, so is Mr. Billings.

Meantime, here we are.

## Jurisdiction and Venue

1. Billings admits that this court has jurisdiction and that venue is proper in this court. Billings denies the remaining allegations, and specifically denies that he has violated any securities law of the United States or of any state.
2. Admitted.
3. Admitted.

4. Admitted.

5. Billings lacks the knowledge or information sufficient to either admit or deny the allegations contained within Paragraph 5.

### Parties

6. Admitted, with the exception of the last sentence of Paragraph 6. Billings denies that the Receiver's legitimate powers or the applicable law give her the authority to bring the claims reflected in Count IV of the Amended Complaint, or to recover the amounts asserted from Billings.

7. Admitted.

8. The first two sentences are admitted. The final sentence is denied.

9. Paragraph 9 asserts no allegations against Billings.

10. Paragraph 10 asserts no allegations against Billings.

11. Paragraph 11 asserts no allegation against Billings.

12. Paragraph 12 asserts no allegations against Billings.

### Factual Allegations Relevant to All Counts

13. Billings lacks the knowledge and information sufficient to admit or deny the allegations contained in Paragraph 13.

14. Denied.

15. Admitted that Paragraph 15 generally describes the way MTP described its timber transactions to potential lenders. Any other allegations are denied.

16. Admitted that lenders received promissory notes reflecting the amounts of their loans and anticipated interest, and supporting documents. Denied that MTP provided lenders with twelve pre-dated checks except with respect to a very limited number of lenders known to Billings. Any remaining allegations are denied.

17. Admitted that Billings and lenders known to Billings did not know and had no reason to know that any documents supporting their loans were anything other than valid. Any remaining allegations are denied.

18. Billings lacks the knowledge and information to admit or deny the allegations contained in Paragraph 18.

19. Billings lacks the knowledge and information to admit or deny the allegations contained in the first sentence of Paragraph 19.  Billings denies the remaining allegations contained in Paragraph 19.

20. Billings admits that he received compensation for each lender he introduced to MTP and who subsequently loaned money to MTP.  The remaining allegations are denied.

21. Admitted on information and belief.

22. Billings admits that the Bill of Information described is accurately quoted in Paragraph 22.  Billings denies the remaining allegations.

23. Billings admits that the SEC complaint described is accurately quoted in Paragraph 23. Billings lacks the knowledge and information to admit or deny the quoted allegations or any other allegations contained in Paragraph 23.

24. Billings admits that Adams pleaded guilty to the federal crime of wire fraud on May 9, 2018.  All other allegations in Paragraph 24 are denied.

**Factual Allegations Relevant to Billings and MDB Group**

25. Denied. Billings was never employed by Butler Snow Advisory Services, LLC ("BSAS"). Billings was an independent contractor to BSAS from 2012-2014.

26. Billings continued working with BSAS as an independent contractor through 2014 on projects unrelated to MTP. Billings affirmatively states that he was paid reasonable commissions of 1.5% to 2.0%, and denies ever being paid a commission in excess of 2.0%. Billings admits that MTP paid him a monthly stipend of $10,000 to $12,500. Any remaining allegations are denied.

27. Denied.

28. Billings admits the general allegations regarding the manner in which MTP timber transactions were described to prospective lenders, in good faith and on reasonable reliance upon information provided by MTP and MTP's history and course of dealings, as well as the hardwood timber market at the times alleged in the Complaint. Any other allegations or inferences of wrongdoing by Billings are denied.

29. Billings introduced MTP to prospective lenders and described MTP in good faith and on reasonable reliance upon information provided by MTP and MTP's history and course of dealings, as well as the hardwood timber market at the times alleged in the Complaint. Any other allegations or inferences of wrongdoing by Billings are denied.

30. Billings denies the allegations contained in Paragraph 30.

    a. Billings denies the allegations contained in Paragraph 30(a). Billings neither knew nor should have known that Adams was fraudulently running MTP as a Ponzi scheme. Since Billings was first introduced to Adams in 2012, Adams

      and MTP were represented by and doing business with reputable, regulated institutions and firms.  Adams and MTP had been promoting and generating timber transactions for many years, without any defaults, from well before Billings's first introduction to Adams in 2012 until April, 2018.  Billings's only role as to MTP was to help introduce prospective lenders to MTP. He did not draft transaction documents, nor was he involved in any negotiations with landowners, timber mills, or lenders.  It was rare for Billings to receive copies of lenders' executed loan documents after transactions were closed and loans funded.  Those documents that Billings did see bore every indication of having been properly notarized and included appropriate land records.  Billings had no reason to be suspicious of a man that never showed any signs of fraudulent behavior, and who was doing regular business with some of the most sophisticated and successful business people known to Billings.

b.    Billings denies the allegations contained in Paragraph 30(b).  MTP and Adams were constantly doing business with and were surrounded by well-regarded investment advisors, banks and law firms.  Billings, and all of the lenders he introduced to MTP, reasonably accepted as true Adams's representations that he had longstanding contacts at, and contracts with, lumber mills. The credibility of MTP's operation was evidenced by the consistent returns that MTP produced. Neither Billings nor his group of highly sophisticated lenders had any reason to contact lumber mills and disrupt working business relationships because there was no reason to be suspicious of Adams's representations.

    c.    Billings denies that the allegations contained in Paragraph 30(c) evidence any sort of wrongdoing or failure-to-act on the part of Billings. As noted above, Adams had been promoting and entering into timber loans and related transactions for many years before Billings's involvement. Billings reasonably relied in good faith on the historical record of a business strategy that had worked consistently for numerous sophisticated lenders.

    d.    Denied.

    e.    Billings admits that Adams represented to Billings and his lenders that Adams had longstanding relationships with lumber mills that withstood typical market pressures. Billings states affirmatively that the market for hardwood timber was strong during the relevant time periods. Billings denies any part of Paragraph 30(e)'s allegations that state or infer any wrongdoing or a failure-to-act on his part. MTP had always delivered to its previous lenders and Billings never saw any red flags or had any reason to challenge or investigate Adams's claimed relationships.

    f.    Billings denies the first sentence of Paragraph 30(f). Billings admits the allegations that lenders he introduced to MTP conducted their financial transactions by wire. Admitted that MTP's banker changed banks in 2016, and Billings alerted inquiring lenders of this fact.

31.    Denied. For many years, Adams operated without even an allegation of impropriety from the most sophisticated and successful business people in the area. When Billings was introduced to Adams in 2012, Adams did not need and was not looking to Billings to give Adams business advice.

32. Billings admits that August, 2017 marked his fifth year being involved with Adams and MTP. Billings states affirmatively that he did not know that Adams was ever running an alleged Ponzi scheme. Billings, along with every lender that loaned money to MTP, was tricked into supporting Adams and MTP not by Billings, but by Adams. Billings denies any remaining allegations of Paragraph 32. The Receiver's use of the quoted material in Paragraph 32 has no relevance to her claims against Billings or the other Defendants. All Paragraph 32 does is show how the Receiver intends to litigate her case: demand that defendants cave in to her demands, or be shamed by highly personalized extraneous allegations.

33. Billings denies that he "induced dozens of persons to invest in [MTP]." Billings admits that he introduced some of his personal friends to MTP who then made loans to MTP. However, it was Adams, MTP's years of success, and the word of mouth of other, satisfied lenders that created the overwhelming demand for MTP's timber transactions and further induced others to lend or extend additional loans to MTP. Billings denies that he was paid commissions in the amount alleged in Paragraph 33.

34. Denied. Billings does admit that MDB Group had no other employees and that Michael Billings was the sole manager/member and controlled MDB Group's finances during this time frame. Billings states affirmatively that he had income unrelated to MTP during the years 2013, 2014, 2015 and 2016.

**Factual Allegations Relevant to Kelly And Kelly Management**

35. Paragraph 35 asserts no factual allegations against Billings.

36. Paragraph 36 asserts no factual allegations against Billings.

**Factual Allegations Relevant to McHenry And First South**

37. Paragraph 37 asserts no factual allegations against Billings.

38. Paragraph 38 asserts no factual allegations against Billings.

39. Paragraph 39 asserts no factual allegations against Billings.

40. Paragraph 40 asserts no factual allegations against Billings.

41. Neither Paragraph 41 nor any of its subparagraphs (a) through (f) assert factual allegations against Billings.

42. Paragraph 42 asserts no factual allegations against Billings.

43. Paragraph 43 asserts no factual allegations against Billings.

44. Paragraph 44 asserts no factual allegations against Billings.

**CAUSES OF ACTION**

**COUNT I**

**Against All Defendants for the Return of Commissions and
Fees Pursuant to the Mississippi Uniform Fraudulent Transfer Act**

45. Billings reasserts his answers to paragraphs 1-44.

46. Paragraph 46 asserts only a legal conclusion and does not require an admission or denial by Billings.

47. The first sentence of Paragraph 47 asserts only a legal conclusion that does not require an admission or denial by Billings. Billings denies the legal conclusions and allegations contained in the second sentence of Paragraph 47.

48. Denied.

49. Paragraph 49 asserts no factual allegations against Billings.

50. Paragraph 50 asserts no factual allegations against Billings.

## COUNT II

### Against Defendants Billings and MDB Group for the Return of Commissions and Fees Pursuant to the Texas Uniform Fraudulent Transfer Act

51. Billings reasserts his answers to paragraphs 1-50.

52. Paragraph 52 asserts a legal conclusion which does not require an admission or denial by Billings. To the extent that Paragraph 52 makes any factual allegations, they are denied.

53. The first sentence of Paragraph 53 asserts legal conclusions which do not require an admission or denial by Billings. To the extent that the first sentence of Paragraph 53 makes any factual allegations, they are denied. Billings denies the legal conclusion and allegations contained in the second sentence of Paragraph 53.

54. Denied.

55. Denied.

## COUNT III

### Against All Defendants for Unjust Enrichment

56. Billings reasserts his answers to paragraphs 1-55.

57. Billings lacks the knowledge and information to admit or deny that MTP operated as a Ponzi scheme at all relevant times. All remaining allegations contained within Paragraph 57 are denied.

58. Denied.

59. Paragraph 59 asserts no factual allegations against Billings.

60. Paragraph 60 asserts no factual allegations against Billings.

## COUNT IV

### For Disgorgement of Commissions Earned in Violation of 15 U.S.C. § 77e and Miss. Code Ann. § 75-71-301

61. Billings reasserts his answers to paragraphs 1-60.

62. Billings has moved to dismiss Count IV of the Complaint. **[Dkts. 23 & 24]**

63. Billings has moved to dismiss Count IV of the Complaint. **[Dkts. 23 & 24]**

64. Billings has moved to dismiss Count IV of the Complaint. **[Dkts. 23 & 24]**

65. Billings has moved to dismiss Count IV of the Complaint. **[Dkts. 23 & 24]**

66. Billings has moved to dismiss Count IV of the Complaint. **[Dkts. 23 & 24]**

## COUNT V

### Against Billings, MDB Group, McHenry, and First South for Entry of Preliminary and Permanent Injunction

67. Billings reasserts his answers to paragraphs 1-66.

68. Denied. The Receiver's information is incorrect and her belief is ill-informed. From 2012-2016, MDB Group earned over $330,000 in income from sources entirely unrelated to MTP.

69. Denied. Paragraph 69 presents a hypothetical—speculating that Billings will be unable to satisfy a monetary judgment at some time in the future. Such a hypothetical is not an appropriate consideration for determining whether to issue an injunction: "argu[ing] that [an] injunction [is] necessary 'to maintain the status quo'[] misconceives the central purpose of a preliminary injunction, which is to prevent irreparable harm. . . . Maintenance of the status quo is only a sometimes concomitant of preventing

irreparable harm -- never the touchstone for such injunctive relief." *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975).

70. Paragraph 70 asserts no factual allegations against Billings.

71. Paragraph 71 asserts no factual allegations against Billings.

72. Paragraph 72 presents an unsupported legal conclusion, which Billings denies. To the extent that Paragraph 72 also asserts any factual allegations, they are also denied.

73. Denied. At all material times Billings delivered reasonably equivalent value and acted in good faith when introducing prospective lenders to Adams and MTP and Billings is not subject to forfeiture of commissions and payments earned by him while acting in good faith.

74. Denied. Billings has not and will not dissipate any of his assets throughout the course of these proceedings. But he does have ongoing monthly living expenses, as do we all. The Receiver's perceived future difficulty in possibly recovering money damages is insufficient to demonstrate irreparable harm. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Deerfield Medical Center v. Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981).

75. Denied.

76. Denied.

77. Denied.

78. Denied.

The unnumbered ad damnum paragraph beginning with the word "WHEREFORE", and all of its subparagraphs, are denied.

Respectfully submitted, this the 31st day of October, 2018.

**MICHAEL D. BILLINGS** and **MDB GROUP, LLC**
*Defendants*

By: /s/ *R. Andrew Taggart, Jr.*
     R. ANDREW TAGGART, JR. (MSB# 7422)

/s/ *David G. Porter*
DAVID G. PORTER (MSB# 104828)

**OF COUNSEL:**

R. Andrew Taggart, Jr. (MSB# 7422)
David G. Porter (MSB# 104828)
TAGGART, RIMES & GRAHAM, PLLC
1022 Highland Colony Parkway, Suite 101
Ridgeland, Mississippi 39157
Telephone: (601) 898-8400
Facsimile: (601) 898-8420
andy@trglawyers.com
dave@trglawyers.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 31, 2018 I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all attorneys of record in this matter.  I further certify that I have mailed by United States Postal Service the document to the following non-ECF participants: NONE.

SO CERTIFIED, this the 31st day of October, 2018.

/s/ *R. Andrew Taggart, Jr.*
R. ANDREW TAGGART, JR.