UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL D. BILLINGS and MDB GROUP, LLC; TERRY WAYNE KELLY, JR. and KELLY MANAGEMENT, LLC; and WILLIAM B. MCHENRY, JR. and FIRST SOUTH INVESTMENTS, LLC,<br><br>Defendants. | Case No. 3:18-cv-00679<br><br>Arising out of Case No. 3:18-cv-252, *Securities and Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*<br><br>Hon. Carlton W. Reeves, District Judge |

**MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT ON THE RECEIVER'S
FRAUDULENT TRANSFER CLAIMS**

Plaintiff Alysson Mills, in her capacity as the court-appointed receiver (the "Receiver") for Arthur Lamar Adams ("Adams") and Madison Timber Properties, LLC ("Madison Timber"), through undersigned counsel, respectfully files this memorandum in support of her Motion for Summary Judgment against Michael D. Billings and MDB Group, LLC (sometimes collectively, "Billings") and William B. McHenry, Jr. and First South Investments, LLC (sometimes collectively, "McHenry").

# INTRODUCTION

In this motion, the Receiver asks for summary judgment on her fraudulent transfer claims, Counts I and II of her complaint, only. The Receiver shows that the commissions that Adams and Madison Timber paid to Billings and McHenry were fraudulent transfers because they were proceeds of a Ponzi scheme. The law entitles the Receiver to recover those proceeds from Billings and McHenry, for the benefit of the Receivership Estate.

For purposes of this motion, the Receiver does not have to prove that Billings or McHenry knew or should have known the commissions were proceeds of a Ponzi scheme. Billings's and McHenry's good or bad faith is irrelevant to whether the commissions must be returned; it is enough under the law that Madison Timber was a Ponzi scheme. The Receiver does not offer new evidence that might establish Billings's and McHenry's knowledge at this time.[1] This motion instead focuses solely on the fact of the Ponzi scheme itself.

# BACKGROUND

*Madison Timber*

Adams, through Madison Timber, operated a Ponzi scheme that defrauded hundreds of investors. Investors in Madison Timber believed that Madison Timber used investors' money to purchase timber from Mississippi landowners; that Madison Timber sold the timber to Mississippi lumber mills at a higher price; and that Madison Timber repaid investors their principal and promised interest with the proceeds of those sales. Investors received timber deeds and cutting agreements that purported to secure their investments—but the documents were fake.[2] The money

---

[1] The Receiver reserves the right to do so as future circumstances may require.
[2] Docket No. 1, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss), at ¶ 9. *See also* transcript of Adams's sentencing on October 29 and 30, 2018, forthcoming.

used to repay existing investors came from new investors.[3] Like any Ponzi scheme, Madison Timber required more and more new investors to continue.

Adams's recruiters, or "bird dogs," identified new investors and sold to them Madison Timber investments. For each investment made by an investor he personally recruited, each recruiter received a cut of the investor's payment to Madison Timber.

In April 2018, on the heels of investigations of him by the F.B.I. and the U.S. Attorney's Office for the Southern District of Mississippi, Adams turned himself in. The U.S. Attorney's Office for the Southern District of Mississippi charged Adams with two counts of wire fraud and one count of bank fraud in connection with a broader scheme to defraud. Among other things, the bill of information states that as "part of the scheme and artifice to defraud" Adams "paid commissions to recruiters who referred investors to [him]":

> The commissions were paid from investors' money. For example, ADAMS paid one recruiter approximately two million four hundred forty-five thousand four hundred and forty-nine dollars ($2,445,449) in commissions in 2017 alone. ADAMS paid another recruiter approximately one million six hundred twenty-eight thousand one hundred dollars ($1,628,100) in commissions in 2017 . . . .[4]

Separately, the S.E.C. charged Adams with violations of the Securities Act of 1933 and Securities & Exchange Act of 1934, alleging in its complaint that "[b]eginning in approximately 2004," Adams, through Madison Timber, "committed securities fraud by operating a Ponzi scheme."[5]

On May 9, 2018, Adams pleaded guilty to the federal crime of wire fraud and admitted "all of the conduct of the entire scheme and artifice to defraud as set forth" in the bill of information.[6]

---

[3] Docket No. 1, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss), at ¶ 10.
[4] Docket No. 1, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss), at ¶ 11.
[5] Docket No. 3, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss), at ¶ 1.
[6] Docket No. 11, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss).

Most recently, during his sentencing hearing, Adams testified that Madison Timber operated as a classic Ponzi scheme. Since no later than 2005, there were no legitimate revenues and investors were paid from funds obtained from other investors.[7] The fact that Madison Timber was a Ponzi scheme cannot credibly be disputed.

*Billings*

The Receiver's complaint alleges that Billings became a recruiter for Madison Timber by no later than 2012, while he was employed by Butler Snow Business Advisory Services, LLC ("Butler Snow"); that Madison Timber paid Butler Snow a monthly retainer for "strategic business development, strategic financing/capital strategies and overall management advisory" services; that Butler Snow and Billings introduced Madison Timber to potential investors; and that Madison Timber paid Butler Snow and Billings a "success fee" when an investor invested.

The Receiver's complaint alleges that in December 2013, Billings left Butler Snow for the prospect of recruiting new investors to Madison Timber fulltime; that Adams agreed to pay Billings 2%, and later 2.5%, of each dollar of each investment made by an investor that Billings personally recruited; that, in addition, Madison Timber paid Billings a fee of $10,000, and later $12,500, a month; and that these agreements were honored until the collapse of the Ponzi scheme in April 2018.

The Receiver's complaint alleges that among Adams's "bird dogs," Billings was a standout; that when Adams met Billings in 2012, Madison Timber received annual investments of approximately $15,000,000; that with Billings's help, the Ponzi scheme ballooned; that Billings targeted large investors in Texas and California, often dropping certain investors' names to attract

---

[7] The Receiver is awaiting the transcript of the sentencing hearing. She reserves the right to supplement this memorandum and accompanying exhibits following receipt of that transcript.

new investors;[8] that Billings personally "booked" more than $80,000,000 in investments in 2017 alone; and that Billings was always hunting for "more, and more and more!!"[9]

Between 2013 and April 2018, Billings induced dozens of persons to invest in Madison Timber. In exchange, he and MDB Group received Madison Timber "commissions" of not less than $3,513,780.[10]

*McHenry*

The Receiver's complaint alleges that McHenry became a recruiter for Madison Timber by no later than 2010; that McHenry demanded, and Adams agreed to pay to McHenry, 10% of each dollar of each investment made by an investor that McHenry personally recruited; and that the agreement was not committed to writing but was honored until the collapse of the Ponzi scheme in April 2018.

The Receiver's complaint alleges that many of McHenry's investors were elderly retirees; that he met some of them in older adult Sunday school classes; that he cultivated relationships with these individuals by visiting them, praying with them, bestowing gifts on them—even taking them hunting when they could no longer go by themselves; and that although these individuals could not afford to risk their life savings on purported timber investments, McHenry gained their trust and took their money.  The Receiver's complaint alleges that, in one instance, McHenry, after learning at church that one couple was suffering financial difficulties, presented himself as an answer to their prayers and told the couple that God had led him to contact them.

---

[8] Docket Nos. 16-3 and 16-4, Mills v. Billings, et al., No. 3:18-cv-00679 (S.D. Miss).
[9] Docket No. 16-5, Mills v. Billings, et al., No. 3:18-cv-00679 (S.D. Miss).
[10] Exhibit 1, Declaration of Alysson Mills; Exhibit 2, Declaration of J. Lester Alexander, III.

Between 2010 and April 2018, McHenry induced approximately twenty people to invest in Madison Timber. In exchange, he and First South received Madison Timber "commissions" of not less than $3,473,320.[11]

## MATERIAL UNDISPUTED FACTS

For the purposes of this motion, only the following facts, each of which is supported by evidence, matter:

1. Madison Timber was a Ponzi scheme.

- *The bill of information filed by the U.S. Attorney's Office for the Southern District of Mississippi alleges Madison Timber was a Ponzi scheme.*[12]

- *Adams "admit[ted] to all of the conduct of the entire scheme and artifice to defraud" as set forth in the bill of information.*[13]

- *Adams testified at his sentencing hearing that Madison Timber's income came solely from defrauded investors.*[14]

- *The Receiver reviewed records for the bank accounts of Madison Timber and independently confirmed that Madison Timber's income came from defrauded investors.*[15]

- *The Receiver's review of the books and records of Madison Timber confirms that, as Adams acknowledged under oath, funds paid to investors by Madison Timber were taken from funds invested in Madison Timber by investors. Madison Timber had neither legitimate operations nor income, save and except sums invested by duped investors.*[16]

2. Billings recruited new investors to the Madison Timber Ponzi scheme, and Madison Timber in turn paid Billings $3,513,780 from the proceeds.

- *The Receiver and J. Lester Alexander, III, a forensic accountant and Certified Fraud Examiner, reviewed the records for the bank accounts of Madison*

---

[11] Exhibit 1, Declaration of Alysson Mills; Exhibit 2, Declaration of J. Lester Alexander, III.
[12] Docket No. 1, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss), at ¶¶ 8-11, 17.
[13] Docket No. 11, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss), at ¶ 1.
[14] Transcript of Adams's sentencing on October 29 and 30, 2018, forthcoming.
[15] Exhibit 1, Declaration of Alysson Mills.
[16] *See* Exhibit 1, Declaration of Alysson Mills.

>  *Timber and MDB Group and confirmed that MDB Group received $3,513,780 in proceeds from the Madison Timber Ponzi scheme.*[17]

3. McHenry recruited new investors to the Madison Timber Ponzi scheme, and Madison Timber in turn paid Billings $3,473,320 from the proceeds.

- *The Receiver and J. Lester Alexander, III, a forensic accountant and Certified Fraud Examiner, reviewed the records for the bank accounts of Madison Timber and First South and confirmed that First South received $3,473,320 in proceeds from the Madison Timber Ponzi scheme.*[18]

**ARGUMENT**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant "bears the initial responsibility of informing the district court of the basis for its motion." *Celotex*, 477 U.S. at 423. Once the movant makes this showing, the nonmoving party must "establish that there is a genuine issue of material fact such that a reasonable jury might return a verdict in its favor." *Janvey v. Democratic Senatorial Campaign Comm.*, 793 F. Supp. 2d 825, 829 (N.D. Tex. 2011) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986)). This requires the nonmovant to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586. "[A]ctual controversies are resolved in favor of the nonmoving party 'only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts.'" *Janvey v. DSCC*, 793 F. Supp. 2d at 829 (quoting *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525) (5th Cir. 2010) (internal quotation marks omitted)).

---

[17] Exhibit 1, Declaration of Alysson Mills; Exhibit 2, Declaration of J. Lester Alexander, III.
[18] Exhibit 1, Declaration of Alysson Mills; Exhibit 2, Declaration of J. Lester Alexander, III.

There is no actual controversy here. Madison Timber was a Ponzi scheme. As a matter of law, the commissions Madison Timber paid to Billings and McHenry were fraudulent transfers, and Billings and McHenry did not provide reasonably equivalent value for them. The Receiver is entitled to judgment as a matter of law on her fraudulent transfer claims.

### I.      Madison Timber was a Ponzi scheme.

In a "classic Ponzi scheme," the fraudster "us[es] payments from new investors to cover the gains paid to older investors." *Janvey v. Alguire*, 847 F.3d 231, 237 (5th Cir. 2017) (*Alguire II*); *see also Quilling v. Schonsky*, 247 Fed. App'x 583, 586 (5th Cir. 2007) (quoting BLACK'S LAW DICTIONARY 1180 (8th ed. 2004)) (A Ponzi scheme is "[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors."). Madison Timber was a classic Ponzi scheme; it used new money from new investments to pay amounts due on preexisting notes.

Adams was the founder and president of Madison Timber and is the person best positioned to testify to its operations. Adams admitted in his guilty plea that Madison Timber was a Ponzi scheme and that he used new money from new investments to pay amounts due on preexisting notes. Adams's plea agreement is sufficient evidence to establish the existence of a Ponzi scheme. *Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011) (*Alguire I*) (holding that the plea agreement of James Davis, the Chief Financial Officer of Stanford Investment Bank, "when read as a whole, provides sufficient evidence for the district court to assume that the Stanford enterprise constituted a Ponzi scheme *ab initio*").

In connection with his guilty plea, Adams "admit[ted] to all of the conduct of the entire scheme and artifice to defraud" as set forth in the bill of information filed by the U.S. Attorney's

Office for the Southern District of Mississippi.[19] Adams thus admitted that he devised a "scheme and artifice to defraud investors by soliciting millions of dollars of funds under false pretenses, failing to use the investors' funds as promised, and misappropriating and converting investors' funds to [his] own benefit and the benefit of others without the knowledge or authorization of the investors."[20] Adams admitted that Madison Timber was "a sophisticated Ponzi scheme"; that "[i]n furtherance of the Ponzi scheme," he created fake timber deeds and cutting agreements for the purpose of defrauding investors; that he used the proceeds from new investors to "mak[e] payments due and owing to other investors"; that he "paid commissions to recruiters who referred investors to [him]"; and that "[t]he commissions were paid from investors' money."[21]

Separately, the Receiver reviewed records for the bank accounts of Madison Timber and independently confirmed that Madison Timber's income came from defrauded investors. For the time period in question, Madison Timber did not generate any material income from timber sales. Records show that Madison Timber used new money it received from new investments to pay amounts due on preexisting notes and to pay commissions to his recruiters. As custodian of Adams's and Madison Timber's records, the Receiver is qualified to attest to their contents. *See Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006); *see also Schonsky*, 247 Fed App'x at 586 ("[The Receiver's] affidavit, attached to the summary judgment motion, firmly establishes that [the Ponzi scheme's] bank account at JP Morgan Chase was in receipt of investor funds and was the source of Stark's gifts to [the defendant]. That is enough to shift the burden to [the defendant].").

---

[19] Docket No. 11, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss), at ¶ 1.
[20] Docket No. 1, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss), at ¶ 5.
[21] Docket No. 1, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss), at ¶ 11.

Finally, the Receiver and J. Lester Alexander, III, a forensic accountant and Certified Fraud Examiner, reviewed the records for the bank accounts of MDB Group and First South and confirmed that those entities received proceeds from the Madison Timber Ponzi scheme; indeed, Madison Timber commissions were those entities' primary or sole source of income.[22] Billings and McHenry controlled MDB Group and First South, respectively, and directed disbursements from those entities' bank accounts to themselves.

## II.     The commissions were fraudulent.

Under Mississippi's Uniform Fraudulent Transfer Act ("MUFTA"), the Receiver is entitled to avoid any transfers made with "actual intent to hinder, delay or defraud any creditor." MISS. CODE ANN. § 15-3-107(1).[23] As set forth above, Madison Timber was a classic Ponzi scheme. In the Fifth Circuit, "proving that [a transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made." *Alguire I*, 647 F.3d at 598 (quoting *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) (alteration in original)) (analyzing Texas's Uniform Fraudulent Transfer Act); *see also Schonsky*, 247 Fed. App'x at 586 ("[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception.").

In a Ponzi scheme case, a "transferees' knowing participation is irrelevant" to whether a transfer was fraudulent. *Alguire I*, 647 F.3d at 598. A receiver's proof of the existence of a Ponzi scheme "obviat[es] the need to prove fraudulent intent of the *transferees*," here Billings and

---

[22] Exhibit 1, Declaration of Alysson Mills; Exhibit 2, Declaration of J. Lester Alexander, III.

[23] It is the Receiver's understanding that all transfers to Billings and MDB Group were made or deemed to have been made in Mississippi, and therefore those transfers are subject to Mississippi's version of the Uniform Fraudulent Transfer Act. If, however, the Court determines that the transfers to Billings and MDP Group were made or deemed to have been made in Texas, the analysis as to whether the transfers may be avoided is the same, because Texas's Uniform Fraudulent Transfer Act, Texas Business and Commerce Code § 24.0001, *et seq.*, is substantively identical to Mississippi's.

McHenry; a receiver need only prove "that each individual received transfers of money from the Ponzi scheme." *Id.* at 599 (emphasis in original). Because the Receiver has established that Madison Timber operated as a Ponzi scheme, she has established that Madison Timber's transfers of money to Billings and McHenry were "presumptively made with the intent to defraud." *Schonsky*, 247 Fed. App'x at 586. The Receiver is entitled to summary judgment voiding the $3,513,780 and $3,473,320, respectively, that Madison Timber paid to Billings and McHenry.

### III.    Billings's and McHenry's good or bad faith is irrelevant.

A defendant may keep money transferred to him if he proves he "took in good faith *and* for reasonably equivalent value." MISS. CODE ANN. § 15-3-113(1) (emphasis added). But that defense is not available to Billings and McHenry, because even if they could prove they took in good faith, they cannot prove they gave reasonably equivalent value for the commissions paid to them.

As a matter of law, a recruiter who induces new investors to invest in a Ponzi scheme does not provide reasonably equivalent value in exchange for his commissions. In *Warfield v. Byron*, 436 F.3d 551 (5th Cir. 2006), the Fifth Circuit affirmed summary judgment for a receiver on his claims under Washington's Uniform Fraudulent Transfer Act to recover commissions paid to an investor who also recruited new investors to a Ponzi scheme.[24] The investor-recruiter argued that he received his commissions in good faith and for fair value. *Id.* at 559. The Fifth Circuit disagreed, explaining that the "primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferor's net worth is preserved." *Id.* at 560. "It takes cheek," the court wrote, "to contend that in exchange for the payments [the defendant] received, the RDI Ponzi

---

[24] The relevant provisions of Washington's Uniform Fraudulent Transfer Act are identical to Mississippi's.

scheme benefitted from [the defendant's] efforts to extend the fraud by securing new investments." *Id.*

The Fifth Circuit did not even reach the question of the investor-recruiter's good faith, because he could not establish reasonably equivalent value. "We need not draw a conclusion on good faith," the court wrote, "as his defense would still fail because he did not receive the transfers from RDI in exchange for reasonably equivalent value." *Id. See also Janvey v. Democratic Senatorial Campaign Comm.*, 793 F. Supp. 2d 825, 858 (N.D. Tex. 2011) (granting summary judgment where defendants failed to produce evidence "establishing the exchange of consideration of a reasonably equivalent value").

Case law from outside the Fifth Circuit is also instructive. The defendant in *Hoffman v. Markowitz*, No. 16-01972, 2017 WL 6940501 (C.D. Cal. July 26, 2017), "acted as a third-party referring agent, whose only admitted task was to directly recruit new investors" to a corporation offering investments in Automated Teller Machines. *Id.* at *5. There was no genuine dispute that the corporation "operated as a Ponzi scheme, which by its very nature is doomed to failure." *Id.* Therefore, the United States District Court for the Central District of California "conclude[d] that the Referral Fees received by Defendant d[id] not constitute 'reasonably equivalent value'" and were subject to disgorgement under California's Uniform Voidable Transactions Act. *Id.*

Likewise, in *Wing v. Dockstader*, No. 2:08 cv 776, 2010 WL 5020959, (D. Utah Dec. 3, 2010), *aff'd*, 482 Fed. App'x 361 (10th Cir. 2012), a defendant argued that he provided reasonably equivalent value "by referring investors to [a Ponzi scheme]." *Id.* at *6. The United States District Court for the District of Utah "disagree[d] with the notion that a person paid to refer investors to a Ponzi scheme is more akin to the venture's utility provider than the investors." *Id.* Instead, "a person who refers investors to a Ponzi scheme, whether knowingly or not, is just as involved, and

even more involved, in furthering the scheme as a passive investor." *Id.* The court held that the "fictitious profits to the defendants in this case did not benefit [the Ponzi scheme] and instead simply depleted the scheme's resources faster. Accordingly, the payments were not for reasonably equivalent value and, therefore, were fraudulent transfers." *Id.* at *5.[25]

Given this clear precedent, Billings and McHenry cannot establish reasonably equivalent value, therefore their good or bad faith is irrelevant.[26] The Receiver is entitled to summary judgment in her favor on her fraudulent transfer claims.

---

[25] Other courts have disgorged commissions paid to Ponzi scheme recruiters on the premise that "[j]ust as the law would require innocent investors to disgorge profits obtained from investing in an unlawful Ponzi scheme, it dictates that the court cannot permit the sales agent defendants to unjustly benefit from their unlawful sales of securities in furtherance of a Ponzi scheme." *Hays v. Adam*, 512 F. Supp. 2d 1330 (N.D. Ga. 2007); *see also Cobalt Multifamily Investors I, LLC v. Arden*, No. 06 Civ. 6172, 2010 WL 3191040, at *3 (S.D.N.Y. Sept. 9, 2010) (disgorging commissions because defendants "were paid corporate funds for assisting in a fraudulent scheme to extract money from potential investors—funds that were then steered through the corporation into the pockets of the ringleaders of the fraud"; "The salespeople are plainly not entitled to retain such commission payments, and the receiver appears to be a proper person to pursue those funds on behalf of the estate, which in turn will presumably be held responsible for the ultimate reimbursement of the shareholders.").

[26] If she had to, the Receiver would show that Billings and McHenry did not take in good faith because at a minimum they knew enough facts to have had a duty to inquire. A receiver need not establish that a defendant had actual knowledge of a Ponzi scheme; constructive knowledge, or "inquiry notice," is sufficient. *See Janvey v. GMAG LLC*, No. 3:15-CV-00401-N, 2017 WL 8780882, at *2 (N.D. Tex. Sept. 14, 2017), order amended, 2017 WL 8780883 (N.D. Tex. Dec. 14, 2017) (a court "examines (1) 'whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose' and (2) whether, having been put on inquiry notice, the transferee 'satisf[ied] a 'diligent investigation' requirement'") (quoting *In re Am. Hous. Found.*, 785 F.3d 143, 164 (5th Cir. 2015)) (alteration in original). While the Fifth Circuit did not reach the question of good faith in *Warfield*, it emphasized that the defendant's "failure to inquire about [the Ponzi scheme] more closely, in light of the abundant suspicious information he possessed," raised "serious questions." 436 F.3d at 560. The Tenth Circuit in *In re M&L Bus. Mach. Co.*, 84 F.3d 1330 (10th Cir. 1996), summarized facts establishing the defendant's constructive knowledge, and lack of good faith, in that case:

> [Defendant's] experience as an investor; promised rates of return greatly exceeding the market rate . . . ; an implausible explanation by [the Ponzi scheme's] officials as to how the company could pay these extremely high rates; [the Ponzi scheme's] use of postdated checks to pay investors; [another party's] disclosure that he received a commission for finding investors for [the Ponzi scheme]; and the fact that the company's first check to [defendant] was returned.

*Id.* at 1338–39. The Tenth Circuit examined good faith under Section 548(c) of the Bankruptcy Code in *In re M&L*, rather than under an UFTA statute. Because "UFTA is modeled on § 548(a)(1) of the Bankruptcy Code," cases interpreting Section 548 "may be used to interpret UFTA or its [state-law] equivalent." *Janvey v. Democratic Senatorial Campaign Comm.*, 712 F.3d 185, 194 (5th Cir. 2013).

## CONCLUSION

The few facts that matter cannot be disputed, and the law is clear.  The Receiver is entitled to summary judgment voiding the $3,513,780 and $3,473,320, respectively, that Madison Timber paid Billings and McHenry.

November 6, 2018

Respectfully submitted,

| | |
|---|---|
| */s/ Lilli Evans Bass* | */s/ Rebekka C. Veith* |
| BROWN BASS & JETER, PLLC | FISHMAN HAYGOOD, LLP |
| Lilli Evans Bass, Miss. Bar No. 102896 | *Admitted pro hac vice* |
| LaToya T. Jeter, Miss. Bar No. 102213 | Brent B. Barriere, *Primary Counsel* |
| 1755 Lelia Drive, Suite 400 | Jason W. Burge |
| Jackson, Mississippi 39216 | Kristen D. Amond |
| Tel: 601-487-8448 | Rebekka C. Veith |
| Fax: 601-510-9934 | 201 St. Charles Avenue, Suite 4600 |
| bass@bbjlawyers.com | New Orleans, Louisiana 70170 |
| *Receiver's counsel* | Tel: 504-586-5253 |
| | Fax: 504-586-5250 |
| | bbarriere@fishmanhaygood.com |
| | jburge@fishmanhaygood.com |
| | kamond@fishmanhaygood.com |
| | rveith@fishmanhaygood.com |
| | *Receiver's counsel* |

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of filing to all counsel of record.

In addition, I have separately emailed a copy of the foregoing to:

Andy Taggart
Taggart, Rimes & Graham, PLLC
andy@trglawyers.com

*Counsel for Michael D. Billings and MDB Group, LLC*

Joseph "Whit" Cooper
Farese, Farese & Farese PA
wcooper@fareselaw.com

*Counsel for Terry Wayne Kelly, Jr. and Kelly Management, LLC*

Frank W. Trapp
Phelps Dunbar LLP
frank.trapp@phelps.com

*Counsel for William B. McHenry, Jr. and First South Investments, LLC*

Date:   November 6, 2018          */s/ Rebekka C. Veith*

                                  Admitted *pro hac vice*